1  ANDREW L. PACKARD (State Bar No. 168690)
   ERIK ROPER (State Bar No. 259756)
2  EMILY J. BRAND (State Bar No. 267564)
   Law Offices of Andrew L. Packard
3  100 Petaluma Blvd. N Ste 301
   Petaluma, CA 94952
4  Tel: (707) 763-7227
   Fax: (415) 763-9227
5  E-mail: andrew@packardlawoffices.com

6  Attorneys for Plaintiff CALIFORNIA
   SPORTFISHING PROTECTION ALLIANCE
7

8               UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
9

10

11 CALIFORNIA SPORTFISHING              Case No. 5:12-CV-02286-LHK
   PROTECTION ALLIANCE, a non profit
12 corporation,
                                         **STIPULATION TO DISMISS**
13              Plaintiff,               **PLAINTIFF'S CLAIMS WITH**
                                         **PREJUDICE; [PROPOSED] ORDER**
        vs.                              **GRANTING DISMISSAL WITH**
14                                       **PREJUDICE [FRCP 41(a)(2)]**
   S.G.S. RECYCLING ENTERPRISES,
15 INC., a California corporation;
   STANLEY G. SILVA, JR., an individual,
16

17              Defendants.

18

19 TO THE COURT:

20      Plaintiff California Sportfishing Protection Alliance ("PLAINTIFF" or "CSPA"), and

21 Defendants S.G.S. Recycling Enterprises, Inc. and Stanley G. Silva (collectively,

22 "DEFENDANTS"), Parties in the above-referenced matter, stipulate as follows:

23      **WHEREAS**, on or about March 6, 2012, CSPA provided DEFENDANTS with a Notice

24 of Violations and Intent to File Suit ("60-Day Notice Letter") under Section 505 of the Federal

25 Water Pollution Control Act ("Act" or "Clean Water Act"), 33 U.S.C. § 1365;

26      **WHEREAS**, on May 7, 2012, CSPA filed its Complaint against DEFENDANTS in this

27 Court, *California Sportfishing Protection Alliance v. S.G.S. Recycling Enterprises, Inc., et al.*

28 (USDC, N.D. Cal., Case No. 5:12-CV-02286-LHK) and said Complaint incorporated by

1   reference all of the allegations contained in CSPA's 60-Day Notice Letter;

2      **WHEREAS**, CSPA and DEFENDANTS, through their authorized representatives and

3   without either adjudication of CSPA's claims or admission by DEFENDANTS of any alleged

4   violation or other wrongdoing, have chosen to resolve in full by way of settlement the allegations

5   of CSPA as set forth in CSPA's 60-Day Notice Letter and Complaint, thereby avoiding the costs

6   and uncertainties of further litigation.  A copy of the Parties' proposed settlement agreement

7   ("Settlement Agreement") entered into by and between CSPA and DEFENDANTS is attached

8   hereto as Exhibit A and incorporated by reference.

9      **WHEREAS**, CSPA submitted the Settlement Agreement via certified mail, return receipt

10   requested, to the U.S. EPA and the U.S. Department of Justice ("the agencies") and the 45-day

11   review period set forth at 40 C.F.R. § 135.5 has been completed without objection by the

12   agencies.

13      **NOW THEREFORE, IT IS HEREBY STIPULATED** and agreed to by and between

14   the Parties that CSPA's claims, as set forth in its 60-Day Notice Letter and Complaint, be

15   dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).  The Parties

16   respectfully request an order from this Court dismissing such claims with prejudice.  In

17   accordance with Paragraph 8 of the Consent Agreement, the Parties also request that this Court

18   retain and have jurisdiction over the Parties through July 2, 2016, for the sole purpose of

19   resolving any disputes between the parties with respect to enforcement of any provision of the

20   Settlement Agreement.

21

22

23

24

25

26

27

28

1  Dated:  July 3, 2012                    LAW OFFICES OF ANDREW L. PACKARD

2

3                                          By:   /s/    Emily J. Brand
4                                          Emily J. Brand
                                           Attorneys for Plaintiff
5                                          CALIFORNIA SPORTFISHING PROTECTION
                                           ALLIANCE
6

7  Dated:  September 9, 2012               CASTELLON & FUNDERBURK, LLP

8
                                           By:  /s/   William Funderburk
9                                          William Funderburk
                                           (As authorized on Sept. 4, 2012 – L.R. 131)
10                                         Attorneys for Defendants
                                           S.G.S. RECYCLING ENTERPRISES, INC., *et al.*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## [PROPOSED] ORDER

2

3      Good cause appearing, and the Parties having stipulated and agreed,

4      IT IS HEREBY ORDERED that Plaintiff California Sportfishing Protection Alliance's

claims against Defendants S.G.S. RECYCLING ENTERPRISES, INC. and STANLEY G.

5

SILVA, JR. as set forth in CSPA's 60-Day Notice Letter and Complaint filed in Case No. 5:12-

6

CV-02286-LHK, are hereby dismissed with prejudice, each side to bear their own attorney fees

7

and costs, except as provided for by the terms of the accompanying Settlement Agreement.

8      IT IS FURTHER ORDERED that the Court shall retain and have jurisdiction over the

9

Parties with respect to disputes arising under the Consent Agreement attached to the Parties'

10

Stipulation to Dismiss as Exhibit A.

11      IT IS SO ORDERED.

12

13                                  UNITED STATES DISTRICT COURT FOR THE
                                    NORTHERN DISTRICT OF CALIFORNIA

14

15

16     Dated: September 11, 2012     _____

                                    United States District Court Judge

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

1  ANDREW L. PACKARD (State Bar No. 168690)
   ERIK M. ROPER (State Bar No. 259756)
2  EMILY J. BRAND (State Bar No. 267564)
   Law Offices of Andrew L. Packard
3  100 Petaluma Blvd. N., Suite 301
   Petaluma, CA 94952
4  Tel: (707) 763-7227
   Fax: (707) 763-9227
5  E-mail: Andrew@packardlawoffices.com
            Erik@packardlawoffices.com
6            Emily@packardlawoffices.com

7  ROBERT J. TUERCK (State Bar No. 255741)
   Jackson &Tuerck
8  P.O. Box 148
   429 W. Main Street, Suite C
9  Quincy, CA 95971
   Tel: (530) 283-0406
10 E-mail: bob@jacksontuerck.com

11 Attorneys for Plaintiff
   CALIFORNIA SPORTFISHING
12 PROTECTION ALLIANCE

13

14                    **UNITED STATES DISTRICT COURT**

15                  **NORTHERN DISTRICT OF CALIFORNIA**

16
   CALIFORNIA SPORTFISHING           Case No. 5:12-cv-02286-HRL
17 PROTECTION ALLIANCE, a non-profit
   corporation,
18                                    ~~**[PROPOSED]**~~ **CONSENT AGREEMENT**
                        Plaintiff,
19
            vs.                       (Federal Water Pollution Control Act,
20                                    33 U.S.C. §§ 1251 to 1387)
   S.G.S. RECYCLING ENTERPRISES, INC.,
21 a California corporation, and STANLEY G.
   SILVA, JR., an individual,
22
23                      Defendants.

24
           **WHEREAS**, Plaintiff California Sportfishing Protection Alliance (hereinafter "CSPA") is a
25
   non-profit public benefit corporation dedicated to the preservation, protection, and defense of the
26
   environment, wildlife, and natural resources of California's waters;
27
           **WHEREAS**, Defendant S.G.S. Recycling Enterprises, Inc. and Stanley G. Silva, Jr.
28

(hereinafter "Defendants") own and operate an approximately 1.5-acre scrap metal recycling facility located at 620 Walker Street #1, in Watsonville, California (the "Facility"), Defendant Stanley G. Silva, Jr. is the President of S.G.S. Recycling Enterprises, Inc.;

WHEREAS, CSPA and Defendants collectively shall be referred to as the "Parties;"

WHEREAS, the Facility collects and discharges storm water to the City of Watsonville's storm water drainage system and the City of Watsonville's storm water drainage system ultimately flows into the Pajaro River, which ultimately flows into the Pacific Ocean (a map of the Facility is attached hereto as **Exhibit A** and incorporated herein by reference);

WHEREAS, storm water discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 91-13-DWQ (as amended by Water Quality Order 92-12 DWQ and 97-03-DWQ), issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342 (hereinafter "General Permit");

WHEREAS, on or about March 6, 2012, Plaintiff provided notice of Defendants' violations of the Act, and of its intention to file suit against Defendants ("Notice Letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Central Coast Region ("Regional Board"); and to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A) (a true and correct copy of CSPA's Notice Letter is attached hereto as **Exhibit B** and incorporated herein by reference);

WHEREAS, Defendants deny the occurrence of the violations alleged in the Notice Letter and maintain that they have complied at all times with the provisions of the General Permit;

WHEREAS, CSPA filed a complaint ("Complaint") against Defendants in the United States District Court, Northern District of California, on May 7, 2012;

WHEREAS, for purposes of this Consent Agreement, the Parties stipulate that venue is proper in this Court, and that Defendants do not contest the exercise of jurisdiction by this Court to enter this Consent Agreement;

WHEREAS, this Consent Agreement shall be submitted to the United States Department of Justice for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c); and shall thereafter be submitted for approval by the Court, the date of which approval shall be referred to herein as the "Court Approval Date;"

WHEREAS, at the time the Consent Agreement is submitted for approval to the United States District Court, CSPA shall request a dismissal of the Complaint with prejudice and the Parties shall stipulate and request that the Court retain jurisdiction for the enforcement of this Consent Agreement as provided herein;

WHEREAS, Defendants intend to file a Notice of Termination with the Regional Water Board on the basis that the Facility will close on or before July 31, 2012;

AND WHEREAS, the Parties agree that it is in their mutual interest to resolve this matter without further litigation.

NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES, AND ORDERED AND DECREED BY THE COURT, AS FOLLOWS:

I.    **COMMITMENT OF DEFENDANTS**

1.    **Compliance With General Permit & Clean Water Act.**  Beginning immediately, and throughout the term of this Consent Agreement, Defendants shall commence all measures needed to operate the Facility in full compliance with the requirements of the General Permit and the Clean Water Act, subject to any defenses available under the law.

2.    **Implemented Best Management Practices.**  Defendants agree to implement the following storm water Best Management Practices ("BMPs") at the Facility as long as the Facility is a permitted facility regulated under the General Permit and to the extent not already implemented:

(a)    Place Chemical Oxygen Demand ("COD") collection receptacles at the Facility for use by customers and employees (See, Facility Map, attached as Exhibit A);

(b)    Utilize tarps to cover the Facility's California Redemption Value ("CRV")/glass roll-off bins prior to a forecasted rain event;

(c)     Sweep all paved surfaces of the Facility weekly during the Wet Season (as defined in the General Permit, October 1 – May 31) and contemporaneously record all such sweeping in a Facility sweeping log;

(d)     Ensure that the Facility's current Storm Water Pollution Prevention Plan ("SWPPP") is available for use and review at all times during Facility business hours;

(e)     Ensure that all storm water samples are tested for all parameters required under the General Permit (including Table D), that appropriate method detection limits are used to detect pollutants in storm water discharges and that no samples exceed laboratory hold times;

(f)     Ensure that each Annual Report filed with the Regional Board includes copies of all laboratory analysis supporting the reported sampling results, including chain of custody and QA/QC documentation; and,

(g)     Take all precautionary measures necessary to prevent any and all storm water discharges from the Facility so long as Defendants conduct industrial activities at the Facility.

**3.     Defendants' Cessation of All Industrial Activity at the Facility On or Before July 31, 2012.**  Defendants agree to permanently cease all industry activity at the Facility on or before July 31, 2012.

**4.     Facility Notice of Termination To Be Filed With the Central Coast Regional Board Office By August 1, 2012.**  By August 1, 2012, Defendants shall file a Notice of Termination ("NOT") with the Central Coast Regional Board, terminating Defendants' coverage under the General Permit.  Defendants shall provide proof of this filing to CSPA within three days of filing the document, or by August 3, 2012, whichever comes first, and shall provide CSPA with proof that the NOT was approved or disapproved by the Regional Board, within three days of receiving such acknowledgement from the Regional Board.  In the event that the Regional Board denies Defendants' NOT, Defendants are responsible for continued compliance with the General Permit throughout the term of this Consent Agreement.  Defendants shall continue to implement all required BMPs pursuant to this Consent Agreement until the Facility is no longer conducting industrial activities at the Facility.

**5.     Defendants' Communications To/From Regional and State Boards.**  Beginning

upon mutual execution of this Consent Agreement and for a period of two years, Defendants shall provide CSPA with copies of all documents submitted to or received from the Regional Board or the State Board concerning storm water discharges from the Facility, including, but not limited to, all documents and reports submitted to the Regional Board and/or State Board as required by the General Permit. Such documents and reports shall be provided to CSPA pursuant to the Notice provisions set forth below and contemporaneously with A&S Metals' submission(s) to such agencies. However, Defendants must submit the required documents pursuant to paragraph 4 as set forth above.

## II. MITIGATION AND FEES AND COSTS

**6.     Mitigation Payment In Lieu Of Civil Penalties.**  As mitigation of the Clean Water Act violations alleged in CSPA's Complaint, Defendants agree to pay the sum of Twenty-Two Thousand Five Hundred Dollars ($22,500) within forty-five (45) days after the Court Approval Date to the Rose Foundation for Communities and the Environment ("Rose Foundation") for projects to improve water quality in the Pajaro River, the Pacific Ocean, and/or the Sacramento-San Joaquin River Delta.  Payment shall be remitted to the Rose Foundation at: Rose Foundation for Communities and the Environment, Attn: Tim Little, 6008 College Avenue, Oakland, CA 94618.

**7.     Fees & Costs.**  Defendants agree to reimburse CSPA in the amount of Twenty-Two Thousand Five Hundred Dollars ($22,500) to defray CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs, and all other costs incurred as a result of investigating the activities at the Facility, bringing the Action and negotiating a resolution in the public interest.  Such payment shall be made payable to the "Law Offices of Andrew L. Packard Attorney-Client Trust Account" and remitted to CSPA's counsel at 100 Petaluma Boulevard North, Suite 301, Petaluma, CA 94952 within seven (7) days after the Court Approval Date.

## III. DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT

**8.**     If a dispute under this Consent Agreement arises, or either Party believes that a breach of this Consent Agreement has occurred, the Parties shall meet and confer within fourteen (14) days of receiving written notification from the other Party of a request for a meeting to determine whether a violation has occurred and to develop a mutually agreed upon plan, including implementation dates (if

necessary), to resolve the dispute.  If the Parties fail to meet and confer, or the meet-and-confer does not resolve the issue, after at least fourteen days have passed after the meet-and-confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under the law, including filing a motion with the District Court of California, Northern District, which shall retain jurisdiction over the Action for the limited purposes of enforcement of the terms of this Consent Agreement.  The Parties shall be entitled to seek fees and costs incurred in any such motion, and such fees and costs shall be awarded, pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, 33 U.S.C. §1365(d), and applicable case law interpreting such provision.

9. **CSPA's Waiver and Release.**  Upon Court approval and entry of this Consent Agreement, CSPA, on its own behalf and on behalf of its members, subsidiaries, successors, assigns, directors, officers, agents, attorneys, representatives, and employees, releases Defendants and their officers, directors, employees, shareholders, parents, subsidiaries, and affiliates, and each of their predecessors, successors and assigns, and each of their agents, attorneys, consultants, and other representatives (each a "Released Defendant Party") from, and waives all claims which arise from or pertain to the Action, including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed in this Action, for the alleged failure of Defendants to comply with the Clean Water Act at the Facility up to and including the Court Approval Date.  CSPA further agrees not to seek enforcement of the Clean Water Act against Defendants' current operations in Modesto, Watsonville, Gilroy, and Los Banos until after the termination of this agreement on July 2, 2016.

10. **Defendants' Waiver and Release.**  Defendants, on their own behalf and on behalf of those Released Defendant Parties under their  control, release CSPA (and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representative) from, and waive all claims which arise from or pertain to the Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters

associated with or related to the Action.

11.     Upon the Court Approval Date, the Parties shall file with the Court a Stipulation and Order that shall provide that:

    a.     the Complaint and all claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2); and

    b.     the Court shall retain and have jurisdiction over the Parties with respect to disputes arising under this Agreement.  Nothing in this Consent Agreement shall be construed as a waiver of any Party's right to appeal from an order that arises from an action to enforce the terms of this Consent Agreement.

## IV.   **MISCELLANEOUS PROVISIONS**

12.     The Parties enter into this Consent Agreement for the purpose of avoiding prolonged and costly litigation.  Nothing in this Consent Agreement shall be construed as, and Defendants expressly do not intend to imply, an admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Agreement constitute or be construed as an admission by Defendants of any fact, finding, conclusion, issue of law, or violation of law.  However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Consent Agreement.

13.     The Consent Agreement shall terminate on July 2, 2016.

14.     The Consent Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.  An executed copy of this Consent Agreement shall be valid as an original.

15.     In the event that any one of the provisions of this Consent Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

16.     The language in all parts of this Consent Agreement, unless otherwise stated, shall be construed according to its plain and ordinary meaning.  This Consent Agreement shall be construed pursuant to California law, without regarding to conflict of law principles.

17.     The undersigned are authorized to execute this Consent Agreement on behalf of their

respective Parties and have read, understood and agreed to be bound by all of the terms and conditions of this Consent Agreement.

18.    All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Agreement are contained herein. This Consent Agreement and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Consent Agreement, unless otherwise expressly provided for therein.

19.    **Notices.**  Any notices or documents required or provided for by this Consent Agreement or related thereto that are to be provided to CSPA pursuant to this Consent Agreement shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainier Avenue
Stockton, CA 95204
E-mail: DeltaKeep@me.com

With copies sent to:

Andrew L. Packard
Law Offices of Andrew L. Packard
100 Petaluma Boulevard North, Suite 301
Petaluma, CA 94952
Tel:  (707) 763-7227
E-mail: Andrew@packardlawoffices.com
            Erik@packardlawoffices.com
            Emily@packardlawoffices.com

And to:

Robert J. Tuerck, Esq.
Jackson &Tuerck
P.O. Box 148
429 W. Main Street, Suite C
Quincy, CA 95971
Tel: 530-283-0406
Fax: 530-283-0416
E-mail:Bob@JacksonTuerck.com

Any notices or documents required or provided for by this Consent Agreement or related thereto that are to be provided to Defendants pursuant to this Consent Agreement shall be sent by U.S. Mail,

[PROPOSED] CONSENT AGREEMENT

postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail

transmission to the email addresses listed below:

> Mr. Stanley G. Silva, Jr., President
> S.G.S. Recycling Enterprises, Inc.
> PO Box 955
> Castroville, CA  95012-0955
> Tel:  831-633-3379
> Fax.:  831-633-2447
> E-mail:  sjr@asmetals.com
>
> With copies sent to:
> Jeffery Vezzolo
> SGS Recycling Enterprises, Inc.
> PO Box 955
> Castroville, CA  95012-0955
> Tel:  831-633-3379
> Fax:  831-633-2447
> Email:  jvezzolo@asmetals.com
>
> William W. Funderburk, Jr.
> Ross H. Hirsch
> Castellón& Funderburk LLP
> 811 Wilshire Boulevard, Suite 1025
> Los Angeles, CA 90017
> Tel:  (213)623-7515
> Fax.:  (213) 532-3984
> E-mail: wfunderburk@candffirm.com
> rhirsch@candffirm.com

Each Party shall promptly notify the other of any change in the above-listed contact information.

**20.**     Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

**21.**     No Party shall be considered to be in default in the performance of any of its

obligations when a failure to perform is due to a "Force Majeure."  A Force Majeure event is any

circumstances beyond the Party's control, including, without limitation, any act of God, war, fire,

earthquake, flood, windstorm, natural catastrophe, unexpected and unintended accidents, civil

disturbance, vandalism, sabotage, terrorism,  restraint by court order or public authority, or action or

non-action by or inability to obtain the necessary authorizations or approvals from any governmental

agency.  A Force Majeure event does not include normal inclement weather, such as anything less than

or equal to a 100 year/24-hour storm event, or inability to pay.  Any Party seeking to rely upon this

paragraph shall have the burden of establishing that it could not reasonably have been expected to

avoid, and which by exercise of due diligence has been unable to overcome, the Force Majeure.

22.     If for any reason the Court should decline to approve this Consent Agreement in the form presented, the Parties shall use their best efforts to work together to modify the Consent Agreement within thirty (30) days so that it is acceptable to the Court.  If the Parties are unable to modify this Consent Agreement in a mutually acceptable manner, this Consent Agreement shall become null and void.

23.     This Consent Agreement shall be deemed to have been drafted equally by the Parties, and shall not be interpreted for or against any Settling Party on the ground that any such party drafted it.

24.     This Consent Agreement and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Consent Agreement, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings, and communications of the Parties, whether oral or written, respecting the matters covered by this Consent Agreement.  This Consent Agreement may be amended or modified only by a writing signed by the Parties or their authorized representatives, and then by order of the Court.

25.     Except in case of an emergency but subject to the regulatory authority of any applicable governmental authority, any breach of or default under this Consent Agreement capable of being cured shall be deemed cured if, within five (5) days of first receiving notice of the alleged breach or default, or within such other period approved in writing by the Party making such allegation, which approval shall not be unreasonably withheld, the party allegedly in breach or default has completed such cure or, if the breach or default can be cured but is not capable of being cured within such five (5) day period, has commenced and is diligently pursuing to completion such cure.

The Parties hereto enter into this Consent Agreement and respectfully submit it to the Court for its approval and entry as an Order and Final Judgment.


Dated: _____          California Sportfishing Protection Alliance


By: _____
Bill Jennings, Executive Director

[PROPOSED] CONSENT AGREEMENT

CONFIDENTIAL SETTLEMENT COMMUNICATION – CSPA DRAFT 5/31/12

1    22.    If for any reason the Court should decline to approve this Consent Agreement in the

2    form presented, the Parties shall use their best efforts to work together to modify the Consent

3    Agreement within thirty (30) days so that it is acceptable to the Court.  If the Parties are unable to

4    modify this Consent Agreement in a mutually acceptable manner, this Consent Agreement shall

5    become null and void.

6    23.    This Consent Agreement shall be deemed to have been drafted equally by the Parties,

7    and shall not be interpreted for or against any Settling Party on the ground that any such party drafted

8    it.

9    24.    This Consent Agreement and the attachments contain all of the terms and conditions

10   agreed upon by the Parties relating to the matters covered by the Consent Agreement, and supersede

11   any and all prior and contemporaneous agreements, negotiations, correspondence, understandings, and

12   communications of the Parties, whether oral or written, respecting the matters covered by this Consent

13   Agreement.  This Consent Agreement may be amended or modified only by a writing signed by the

14   Parties or their authorized representatives, and then by order of the Court.

15   25.    Except in case of an emergency but subject to the regulatory authority of any applicable

16   governmental authority, any breach of or default under this Consent Agreement capable of being cured

17   shall be deemed cured if, within five (5) days of first receiving notice of the alleged breach or default,

18   or within such other period approved in writing by the Party making such allegation, which approval

19   shall not be unreasonably withheld, the party allegedly in breach or default has completed such cure

20   or, if the breach or default can be cured but is not capable of being cured within such five (5) day

21   period, has commenced and is diligently pursuing to completion such cure.

22   The Parties hereto enter into this Consent Agreement and respectfully submit it to the Court for

23   its approval and entry as an Order and Final Judgment.

24

25   Dated: _3 July 2012_                    California Sportfishing Protection Alliance

26

27                                         By: _____

28                                              Bill Jennings, Executive Director

-10-
{PROPOSED} CONSENT AGREEMENT

1

2

Dated: _____      S.G.S. Recycling Enterprises, Inc.

3

4

By:   _____

5

Stanley G. Silva, Jr., President

6

7

Dated: _____      Stanley G. Silva, Jr.

8

9

By:   _____

10

Stanley G. Silva, Jr.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] CONSENT AGREEMENT

**CONFIDENTIAL SETTLEMENT COMMUNICATION – CSPA DRAFT 5/31/12**

1

2  Dated: 7/3/2012                    S.G.S. Recycling Enterprises, Inc.

3

4                                     By: _____

5                                          Stanley G. Silva, Jr., President

6

7  Dated: 7/3/2012                    Stanley G. Silva, Jr.

8

9                                     By: _____

10                                         Stanley G. Silva, Jr.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-11-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**EXHIBIT A – Facility Site Map**

24
25
26

28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23      **EXHIBIT B – Notice of Violation**
24
25
26

28



March 6, 2012

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Stanley G. Silva, Jr., owner
S.G.S. Recycling Enterprises, Inc., facility business name "A&S Metals"
620 Walker Street, #1
Watsonville, CA 95076

Stanley G. Silva, Jr., Agent for Service of Process
S.G.S. Recycling Enterprises, Inc.
11340 Commercial Pkwy
Castroville, CA 95012

Re:     **Notice of Violations and Intent to File Suit Under the Federal Water**
        **Pollution Control Act**

Dear Mr. Silva:

I am writing on behalf of the California Sportfishing Protection Alliance
("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at the
S.G.S. Recycling Enterprises, Inc. ("A&S Metals") facility, located at 620 Walker Street,
#1 in Watsonville, California ("the Facility"). The Facility Operator is S.G.S. Recycling
Enterprises, Inc., and the Facility business name is "A&S Metals." The WDID
identification number for the Facility is 3 44I022055. CSPA is a non-profit public
benefit corporation dedicated to the preservation, protection and defense of the
environment, wildlife and natural resources of the Pajaro River and other California
waters. This letter is being sent to you as the responsible owner, officer, or operator of
the Facility. Unless otherwise noted, S.G.S. Recycling Enterprises, Inc. and Stanley G.
Silva, Jr. shall hereinafter be collectively referred to as A&S Metals.

This letter addresses A&S Metals' unlawful discharges of pollutants from the
Facility to the City of Watsonville's storm water drainage system, which then conveys
that storm water into the Pajaro River. This letter addresses the ongoing violations of the

substantive and procedural requirements of the Clean Water Act and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 97-03-DWQ ("General Permit" or "General Industrial Storm Water Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("the EPA"), and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, S.G.S. Recycling Enterprises, Inc. and Stanley G. Silva, Jr. are hereby placed on formal notice by CSPA that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court against S.G.S. Recycling Enterprises, Inc. and Stanley G. Silva, Jr. under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Permit. These violations are described more fully below.

## I.    Background.

A&S Metals owns and operates a scrap metal recycling facility located in Watsonville, California. The Facility falls under Standard Industrial Classification ("SIC") Code 5093 ("Scrap Recycling Facilities"). The Facility is primarily used to receive, store, handle, recycle and transport scrap metals. Other activities at the Facility include the use and storage of heavy machinery and motorized vehicles, including trucks used to haul materials to, from and within the Facility.

A&S Metals collects and discharges storm water from its approximately 1.5-acre Facility through at least one (1) discharge point into the City of Watsonville's storm water drainage system. From that system, A&S Metals' storm water drains into the Pajaro River, and finally into the Pacific Ocean. The Pajaro River and its tributaries are waters of the United States within the meaning of the Clean Water Act.

The Central Coast Regional Water Quality Control Board ("Regional Board") has established water quality standards for the Pajaro River in the "Water Quality Control Plan for the Central Coast Basin" ("Basin Plan"). The Basin Plan requires "[a]ll waters shall be maintained free of toxic substances in concentrations which are toxic to, or which produce detrimental physiological responses in, human, plant, animal, or aquatic life." For the Pajaro River, the Basin Plan establishes surface water quality objectives, including: total dissolved solids - 1000 mg/L; chlorine – 250 mg/L; sodium sulfate – 250 mg/L; boron – 1.0 mg/L; and sodium – 200 mg/L. *Id*. at III-13, Table 3-7. The Basin Plan also requires "[t]he pH value shall neither be depressed below 6.5 nor raised above 8.3." *Id*. at III-5. Further, it prohibits the discharges of oil and grease, stating that

"[w]aters shall not contain oils, greases, waxes, or other similar materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses." *Id*. at III-3.

The Basin Plan provides maximum contaminant levels ("MCLs") for organic concentrations and inorganic and fluoride concentrations, not to be exceeded in domestic or municipal supply. *Id*. at III-6 - III-7. It requires that water designated for use as domestic or municipal supply shall not exceed the following maximum contaminant levels: aluminum – 1.0 mg/L; arsenic - 0.05 mg/L; lead - 0.05 mg/L; and mercury - 0.002 mg/L. *Id*. at III-7. The EPA has also issued recommended water quality criterion MCLs, or Treatment Techniques, for mercury - 0.002 mg/L; lead – 0.015 mg/L; chromium – 0.1 mg/L; and, copper – 1.3 mg/L. The EPA also issued a recommended water quality criteria for aluminum for freshwater aquatic life protection of 0.087 mg/L. In addition, the EPA has established a secondary MCL, consumer acceptance limit for aluminum - 0.05 mg/L to 0.2 mg/L and zinc - 5.0 mg/L. *See* http://www.epa.gov/safewater/ mcl.html. Finally, the California Department of Health Services has established the following MCL, consumer acceptance levels: aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); chromium – 0.5 mg/L (primary); copper – 1.0 mg/L (secondary); iron – 0.3 mg/L; and zinc – 5.0 mg/L. *See* California Code of Regulations, title 22, §§ 64431, 64449.

The California Toxics Rule ("CTR"), issued by the EPA in 2000, establishes numeric receiving water limits for certain toxic pollutants in California surface waters. 40 CFR § 131.38**.** The CTR establishes the following numeric limits for freshwater surface waters: arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous concentration); chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L (continuous concentration); copper – 0.013 mg/L (maximum concentration) and 0.009 mg/L (continuous concentration); lead – 0.065 mg/L (maximum concentration) and 0.0025 mg/L (continuous concentration).

The Regional Board has identified waters of the Central Coast as failing to meet water quality standards for pollutant/stressors such as unknown toxicity, numerous pesticides, and mercury. *See* www.swrcb.ca.gov/water_issues/programs/tmdl/docs/- 2002reg3303dlist.pdf. It identified that the Pajaro River fails to meet water quality standards due to the pollutant/stressors fecal coliform, nutrients, and sedimentation/siltation. Discharges of listed pollutants into an impaired surface water may be deemed a "contribution" to the exceedance of CTR, a water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures. *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918 (9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger covered by the General Industrial Storm Water Permit was "subject to effluent limitation as to certain pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

The General Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by A&S Metals: iron – 1.0 mg/L; pH – 6.0 – 9.0 s.u.; oil & grease – 15 mg/L; aluminum – 0.75 mg/L; lead – 0.0816 mg/L; and, total suspended solids – 100.0 mg/L. The State Water Quality Control Board has also proposed adding a benchmark level for specific conductance - 200 μmhos/cm. Additional EPA benchmark levels have been established for other parameters that CSPA believes are being discharged from the Facility, including but not limited to, arsenic – 0.16854 mg/L; copper – 0.0636 mg/L; cyanide – 0.0636 mg/L; chemical oxygen demand – 120 mg/L; magnesium – 0.0636 mg/L; manganese – 1.0 mg/L; mercury – 0.0024 mg/L; and zinc – 0.117 mg/L.

## II.    A&S Metals Is Violating the Act by Discharging Pollutants From the Facility to Waters of the United States.

Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges. *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984). Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutants by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements. 33 U.S.C. § 1311(a). The duty to apply for a permit extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ." 40 C.F.R. § 122.30(a).

The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, a variety of metals, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6). A point source is defined as "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). An industrial facility that discharges pollutants into a navigable water is subject to regulation as a "point source" under the Clean Water Act. *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993). "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7). Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States. *See Headwaters, Inc. v Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001).

The Pajaro River and its tributaries are waters of the United States. Accordingly, A&S Metals' discharges of storm water containing pollutants from the Facility are discharges to waters of the United States.

CSPA is informed and believes, and thereupon alleges, that A&S Metals has discharged and is discharging pollutants from the Facility to waters of the United States every day that there has been or will be any measurable flow of water from the Facility since February 26, 2009. Each discharge on each separate day is a separate violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These unlawful discharges are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, A&S Metals is subject to penalties for violations of the Act since February 26, 2009.

### III.    Pollutant Discharges in Violation of the NPDES Permit.

A&S Metals has violated and continues to violate the terms and conditions of the General Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit such as the General Permit. 33 U.S.C. § 1342. The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT. Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). Conventional pollutants are TSS, Oil & Grease ("O&G"), pH, biochemical oxygen demand ("BOD"), and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. *Id.*; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the General Permit provides: "Except as allowed in Special Conditions (D.1.) of this General Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited. Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit." Special Conditions D(1) of the General Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water discharge.

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Based on its review of available public documents, CSPA is informed and believes: (1) that A&S Metals continues to discharge pollutants in excess of benchmarks and (2) that A&S Metals has failed to implement BMPs adequate to bring its discharge of these and other pollutants in compliance with the General Permit. A&S Metals' ongoing violations are discussed further below.

**A.      A&S Metals Has Discharged Storm Water Containing Pollutants in Violation of the Permit.**

A&S Metals has discharged and continues to discharge storm water with unacceptable levels of Iron (Fe), Aluminum (Al), Total Suspended Solids (TSS), and Specific Conductance (SC) in violation of the General Permit. These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A. A&S Metals' Annual Reports and Sampling and Analysis Results confirm discharges of materials other than storm water and specific pollutants in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit:

**1.      Discharge of Storm Water Containing Iron (Fe) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------|---------------------------|-----------------|
| 2/23/2010 | Fe | 6.28 mg/L | 1.0 mg/L |
| 1/18/2010 | Fe | 14.33 mg/L | 1.0 mg/L |

**2.      Discharge of Storm Water Containing Al at Concentration in Excess of EPA Benchmark Value.**

| Date | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------|---------------------------|-----------------|
| 2/23/2010 | Al | 9.07 mg/L | 0.75 mg/L |
| 1/18/2010 | Al | 9.15 mg/L | 0.75 mg/L |
| 3/2/2009 | Al | 0.93 mg/L | 0.75 mg/L |

3.      **Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------|---------------------------|-----------------|
| 2/23/2010 | TSS | 388 mg/L | 100 mg/L |
| 1/18/2010 | TSS | 368 mg/L | 100 mg/L |
| 4/7/2009 | TSS | 140 mg/L | 100 mg/L |
| 3/2/2009 | TSS | 202 mg/L | 100 mg/L |

4.      **Discharge of Storm Water Containing Specific Conductance (SC) at Concentration in Excess of Proposed EPA Benchmark Value.**

| Date | Parameter | Concentration in Discharge | Proposed Benchmark Value |
|------|-----------|---------------------------|--------------------------|
| 3/18/2011 | SC | 544 µmhos/cm | 200 µmhos/cm |
| 11/1/2010 | SC | 542 µmhos/cm | 200 µmhos/cm |
| 2/23/2010 | SC | 509 µmhos/cm | 200 µmhos/cm |
| 1/18/2010 | SC | 510 µmhos/cm | 200 µmhos/cm |
| 4/7/2009 | SC | 556 µmhos/cm | 200 µmhos/cm |
| 3/2/2009 | SC | 561 µmhos/cm | 200 µmhos/cm |

CSPA's investigation, including its review of A&S Metals' analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's benchmark values and the State Board's proposed benchmark levels for specific conductivity, indicates that A&S Metals has not implemented BAT and BCT at the Facility for its discharges of Iron (Fe), Aluminum (Al), Total Suspended Solids (TSS), Specific Conductance (SC) and other pollutants, in violation of Effluent Limitation B(3) of the General Permit.  A&S Metals was required to have implemented BAT and BCT by

no later than October 1, 1992 or the start of its operations.  Thus, A&S Metals is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

CSPA is informed and believes that A&S Metals has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least February 26, 2009.  CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every single significant rain event that has occurred since February 26, 2009, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit.  Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that A&S Metals has discharged storm water containing impermissible levels of Iron (Fe), Aluminum (Al), Total Suspended Solids (TSS), Specific Conductance (SC) and other unmonitored pollutants (e.g. copper (Cu), zinc (Zn), and chemical oxygen demand (COD)) in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing.  Each discharge of storm water containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the General Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, A&S Metals is subject to penalties for violations of the General Permit and the Act since February 26, 2009.

**B.     A&S Metals Has Failed to Implement an Adequate Monitoring & Reporting Plan.**

Section B of the General Industrial Storm Water Permit requires that dischargers develop and implement an adequate Monitoring and Reporting Plan by no later than October 1, 1992 or the start of operations.  Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual observations of non-storm water and storm water discharges from the Facility and to record and report such observations to the Regional Board.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon.  Oil and grease may be substituted for total organic carbon. Section B(5)(c)(ii) of the General Permit further requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  Section B(10) of the General Permit provides that "facility operators shall explain how the facility's monitoring program will satisfy the monitoring program objectives of [General Permit] Section B.2."

Notice of Violation and Intent To File Suit
March 6, 2012
Page 9 of 17

Based on its investigation, CSPA is informed and believes that A&S Metals has failed to develop and implement an adequate Monitoring & Reporting Plan. First, based on its review of publicly available documents, CSPA is informed and believes that A&S Metals has failed to collect storm water samples during at least two qualifying storms events, as defined by the General Permit, during the past three Wet Seasons. Second, based on its review of publicly available documents, CSPA is informed and believes that A&S Metals has failed to conduct the monthly visual monitoring of storm water discharges and the quarterly visual observations of unauthorized non-storm water discharges required under the General Permit during the past three Wet Seasons. Third, based on its review of publicly available documents, CSPA is informed and believes that for the past three Wet Seasons A&S Metals has failed to analyze samples for the pollutants that the General Permit requires A&S Metals to analyze, based on its SIC Code 5093, which includes copper (Cu), zinc (Zn), and chemical oxygen demand (COD). Fourth, based on its review of publicly available documents, CSPA is informed and believes that for the past three Wet Seasons A&S Metals has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility. Each of these failures constitutes a separate and ongoing violation of the General Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, A&S Metals is subject to penalties for violations of the General Industrial Storm Water Permit and the Act since February 26, 2009. These violations are set forth in greater detail below:

> **1.     A&S Metals Has Failed to Collect Storm Water Samples During at Least Two Rain Events In Each of the Last Three Wet Seasons.**

Based on its review of publicly available documents, CSPA is informed and believes that A&S Metals has failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during each of the past three years, as required by the General Permit. For example, CSPA notes that the Annual Report filed by A&S Metals for the Facility for the 2010-2011 Wet Season reported that A&S Metals analyzed samples of storm water discharged during two qualifying storm events that season. However, upon closer scrutiny it turns out that neither storm sampled was a qualifying storm event within the meaning of the General Permit (discussed further below). Similarly, in the 2009-2010 Annual Report, A&S Metals sampled from two storm events which were not qualifying storm events, either.

A&S Metals reported in all three Wet Seasons (i.e., 2008-2009; 2009-2010; and 2010-2011 Wet Seasons), that the Facility sampled the first storm of the season, when in fact it did not sample the first storm of the season during any Wet Season. For example, A&S Metals reported in its 2009-2010 Annual Report that it sampled the first storm of the Wet Season, but A&S Metals' first sample is from January 18, 2010. Based upon its review of publicly available rainfall data, CSPA is informed and believes that the first storm of the 2009-2010 Wet Season occurred as early as Monday, October 12, 2009,

when 0.18" of rain fell on the Facility.  This failure to adequately monitor storm water discharges constitutes separate and ongoing violations of the General Permit and the Act.

**2.      A&S Metals Has Failed to Collect Storm Water Samples from Each Discharge Point During at Least Two Rain Events In Each of the Last Three Wet Seasons.**

Based on its review of publicly available documents, CSPA is informed and believes that A&S Metals has failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during each of the past three Wet Seasons.  Further, based on its investigation, CSPA is informed and believes that storm water discharges from the Facility at points other than the one sampling/discharge point currently designated by A&S Metals.  This failure to adequately monitor storm water discharges constitutes separate and ongoing violations of the General Permit and the Act.

**3.      A&S Metals Has Failed to Conduct the Monthly Wet Season Observations of Storm Water Discharges Required by the General Permit.**

The General Permit requires dischargers to "visually observe storm water discharges from one storm event per month during the Wet Season (October 1 – May 30)."  General Permit, Section B(4)(a).  As evidenced by the entries on Form 4 Monthly Visual Observations contained in A&S Metals' annual reports for the last three Wet Seasons, CSPA is informed and believes that A&S Metals has failed to properly conduct this requirement of the General Permit.

Specifically, A&S Metals failed to conduct monthly visual observations of discharges from qualifying storm events for most months during any of the past three Wet Seasons.  Instead, A&S Metals documented its visual observations of storm water that discharged during non-qualifying storm events or on dates during which no rain fell on the Facility, for most months during the entire Wet Season of each of the past three years (discussed further below).  However, based on publicly available rainfall data, CSPA is informed and believes that there were many qualifying storm events during each of these Wet Seasons that A&S Metals could have observed.

For example, A&S Metals reported in its 2010-2011 Annual Report that it observed a qualifying storm event on Tuesday November 23, 2010.  However, CSPA is informed and believes that this could not possibly be true because 0.29" of rain fell on the Facility two days prior, on November 21, 2010, likely making the November 21st storm a qualifying storm event and disqualifying all storm events for the next three days.  A&S Metals' failure to conduct this required monthly Wet Season visual monitoring extends back to at least February 26, 2009.  A&S Metals' failure to conduct this required monthly Wet Season visual monitoring has caused and continues to cause multiple, separate and ongoing violations of the General Permit and the Act.

### 4. A&S Metals Is Subject to Penalties for Its Failure to Implement an Adequate Monitoring & Reporting Plan Since February 26, 2009.

CSPA is informed and believes that publicly available documents demonstrate A&S Metals' consistent and ongoing failure to implement an adequate Monitoring Reporting Plan in violation of Section B of the General Permit.  For example, while in its 2010-2011 Annual Report A&S Metals reported having collected samples of storm water discharged during two qualifying storm events, neither storm event was a qualifying storm event within the meaning of the General Permit.  Based on its review of publicly available rainfall data, CSPA is informed and believes that the storm that occurred at the Facility on March 18, 2011 was not a qualifying storm event because enough rain fell on the Facility two days prior to likely result in a discharge of storm water from the Facility, thereby invalidating the storm as a qualifying storm event.  Specifically, A&S Metals sampled a rain event on March 18, 2011 that produced 0.78" of rainfall on the Facility. However, two days prior, on Wednesday, March 16, 2011, 0.16" of rain fell on the Facility.  Therefore, this March 16th storm event likely invalidates any sampling for three days afterwards.

Additionally, A&S Metals is in violation of the General Permit's requirement that the testing method employed in laboratory analyses of pollutant concentrations present in storm water discharged from the Facility be "adequate to satisfy the objectives of the monitoring program."  General Permit Section B.10.a.iii.  The Regional Board has determined that the appropriate laboratory test method to employ when analyzing storm water samples for the presence and concentration of iron is EPA method 200.8.

Additionally, the Regional Board has determined that the appropriate detection limit that should be applied when using EPA method 200.8 is 0.005 mg/L.

However, as demonstrated by A&S Metals' annual report filed for each of the last three Wet Seasons (e.g., 2008-2009; 2009-2010; 2010-2011), the test method employed by the laboratory utilized by A&S Metals to analyze the concentration of iron in the storm water discharged from its Facility was not EPA method 200.8, but rather, EPA method 200.7.  In addition, the laboratory employed by A&S Metals to analyze the storm water sample collected for both samples applied an inappropriately high detection limit of 0.04 mg/L.  In fact, A&S Metals used an inappropriate analysis method for lead, aluminum, and oil & grease in all three of its Annual Reports.

Finally, A&S Metals held its samples for an excessive length of time before turning the samples over to a laboratory for analysis.  In each of the 2009-2010 and 2010-2011 Wet Seasons, A&S Metals held both samples until the middle of June, and the samples were not analyzed until late June.  In 2008-2009, A&S Metals held its first sample over a month before sending both samples together to a lab.  Holding time can negatively impact the validity of the analysis.

A&S Metals is in violation of the General Permit for failing to employ laboratory test methods and detection limits that are adequate to, among other things, "ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in this General Permit."  General Permit Section B.2.a. ("Monitoring Program Objectives").  Accordingly, consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, A&S Metals is subject to penalties for these violations of the General Permit and the Act since February 26, 2009.

### C.   A&S Metals Has Failed to Implement BAT and BCT.

Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  CSPA's investigation indicates that A&S Metals has not implemented BAT and BCT at the Facility for its discharges of Iron (Fe), Aluminum (Al), Total Suspended Solids (TSS), Specific Conductance (SC) and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

To meet the BAT/BCT requirement of the General Permit, A&S Metals must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility.  Based on the limited information available regarding the internal structure of the Facility, CSPA believes that at a minimum A&S Metals must improve its housekeeping practices, store materials that act as pollutant

sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or prevent storm water discharge altogether.  A&S Metals has failed to adequately implement such measures.

A&S Metals was required to have implemented BAT and BCT by no later than October 1, 1992.  Therefore, A&S Metals has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that it fails to implement BAT and BCT.  A&S Metals is subject to penalties for violations of the General Permit and the Act occurring since February 26, 2009.

**D.     A&S Metals Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

Section A(1) and Provision E(2) of the General Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to Water Quality Order No. 97-03-DWQ to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 9, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)).  The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective

(General Permit, Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).  Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

CSPA's investigation and review of publicly available documents regarding conditions at the Facility indicate that A&S Metals has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above.  A&S Metals has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary.  Accordingly, A&S Metals has been in continuous violation of Section A(1) and Provision E(2) of the General Permit every day since October 1, 1992, and will continue to be in violation every day that it fails to develop and implement an effective SWPPP.  A&S Metals is subject to penalties for violations of the Order and the Act occurring since February 26, 2009.

**E.      A&S Metals Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.  The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Receiving Water Limitation C(4)(a).  Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.  *See also* Provision E(6).  Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, A&S Metals is discharging elevated levels of Iron (Fe), Aluminum (Al), Total Suspended Solids (TSS), Specific Conductance (SC) and other unmonitored pollutants that are causing or contributing to exceedances of applicable water quality standards.  For each of these pollutant exceedances, A&S Metals was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, A&S Metals was aware of high levels of these pollutants prior to February 26, 2009.  Likewise, A&S Metals has

Notice of Violation and Intent To File Suit
March 6, 2012
Page 15 of 17

generally failed to file reports describing its noncompliance with the General Permit in
violation of Section C(11)(d). Lastly, the SWPPP and accompanying BMPs do not
appear to have been altered as a result of the annual evaluation required by Section A(9).
A&S Metals has been in continuous violation of Receiving Water Limitation C(4)(a) and
Sections C(11)(d) and A(9) of the General Permit every day since February 26, 2009, and
will continue to be in violation every day it fails to prepare and submit the requisite
reports, receives approval from the Regional Board and amends its SWPPP to include
approved BMPs. A&S Metals is subject to penalties for violations of the General Permit
and the Act occurring since February 26, 2009.

**F.      A&S Metals Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the General Permit requires dischargers to submit an Annual
Report by July 1st of each year to the executive officer of the relevant Regional Board.
The Annual Report must be signed and certified by an appropriate corporate officer.
General Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Permit
requires the discharger to include in their annual report an evaluation of their storm water
controls, including certifying compliance with the General Industrial Storm Water
Permit. *See also* General Permit, Sections C(9) and (10) and B(14).

CSPA's investigation indicates that A&S Metals has submitted incomplete
Annual Reports and purported to comply with the General Permit despite significant
noncompliance at the Facility. For example, A&S Metals reported in every Annual
Report filed for the past three Wet Seasons (i.e., 2008-2009; 2009-2010; and 2010-2011)
that it observed the first storm of every Wet Season. However, as discussed above, based
on CSPA's review of publicly available rainfall data, CSPA believes this cannot possibly
be true.

Further, A&S Metals failed to sample from qualifying storm events in five out of
six storm water samples collected during the last three Wet Seasons. For example, as
listed above, in 2010-2011, A&S Metals sampled from a storm event on March 18, 2011
that was not a qualifying storm event. Further, in the 2009-2010 Annual Report, A&S
Metals reported that it sampled a qualifying storm event on January 18, 2010. Based on
its review of publicly available rainfall data, CSPA is informed and believes that the
storm that occurred at the Facility on January 18, 2010 was not a qualifying storm event
because enough rain fell on the Facility one day prior to likely result in a discharge of
storm water from the Facility, thereby invalidating the January 18, 2010 storm as a
qualifying storm event. Specifically, 0.31" of rain fell on the Facility on Sunday, January
17, 2010.

Further, A&S Metals failed to comply with the monthly visual observations of
storm water discharges requirement for every single Annul Report filed for the Facility
for each of the last three years. In the 2010-2011 Annual Report, A&S Metals did not
observe a single qualifying storm event within the meaning of the General Permit. For
example, A&S Metals reported that it observed a qualifying storm event on December

Notice of Violation and Intent To File Suit
March 6, 2012
Page 16 of 17

22, 2010.  However, based on publicly available rainfall data, CSPA is informed and believes that this cannot possibly be true.  On Tuesday, December 21, 2010, 0.16" of rain fell on the Facility, likely invalidating the storm observed on December 22nd.  In the 2009-2010 Annual Report, A&S Metals reported that it observed discharge from a qualifying storm event on March 11, 2010.  However, based on publicly available rainfall data, CSPA is informed and believes that this cannot possibly be true.  One day prior to March 11th, on Wednesday, March 10, 0.34"of rain fell on the Facility, thereby invalidating the March 11, 2010 storm as a qualifying storm event.

These are only a few examples of how A&S Metals has failed to file completely true and accurate reports.  As indicated above, A&S Metals has failed to comply with the Permit and the Act consistently for at least the past three years; therefore, A&S Metals has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time A&S Metals submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past years.  A&S Metals' failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act. A&S Metals is subject to penalties for violations of Section (C) of the General Permit and the Act occurring since February 26, 2009.

## IV.     Persons Responsible for the Violations.

CSPA puts S.G.S. Recycling Enterprises, Inc. and Stanley G. Silva, Jr. under on notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts S.G.S. Recycling Enterprises, Inc. and Stanley G. Silva, Jr. on notice that it intends to include those persons in this action.

## V.     Name and Address of Noticing Party.

Our name, address and telephone number is as follows:  California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067.

## VI.     Counsel.

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
Erik M. Roper                                Tel. (707) 763-7227
Emily J. Brand                               Fax. (707) 763-9227
Law Offices of Andrew L. Packard            Email:
100 Petaluma Boulevard, Suite 301              Andrew@PackardLawOffices.com
Petaluma, CA 94952

Notice of Violation and Intent To File Suit
March 6, 2012
Page 17 of 17

   Erik@PackardLawOffices.com
   Emily@PackardLawOffices.com

**VII.    Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act S.G.S. Recycling Enterprises, Inc. and Stanley G. Silva, Jr. to a penalty of up to $32,500 per day per violation for all violations occurring after March 15, 2004, and $37,500 per day per violation for all violations occurring after January 12, 2009, during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against S.G.S. Recycling Enterprises, Inc. and Stanley G. Silva, Jr. and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## <u>SERVICE LIST</u>

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Dorothy R. Rice, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Pamela Creedon, Executive Officer
Regional Water Quality Control Board
Central Valley Region
11020 Sun Center Drive #200
Rancho Cordova, CA 95670-6114

**ATTACHMENT A**
**Notice of Intent to File Suit, A&S Metals (Watsonville, CA)**
**Significant Rain Events,\* February 26, 2009 – March 6, 2012**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mar. | 01 | 2009 | Nov. | 07 | 2010 | Nov | 20 | 2011 |
| Mar. | 02 | 2009 | Nov. | 19 | 2010 | | | |
| Mar. | 03 | 2009 | Nov. | 20 | 2010 | | | |
| Mar. | 04 | 2009 | Nov. | 21 | 2010 | | | |
| Mar. | 22 | 2009 | Nov. | 23 | 2010 | | | |
| April | 07 | 2009 | Nov. | 27 | 2010 | | | |
| April | 08 | 2009 | Dec. | 05 | 2010 | | | |
| April | 09 | 2009 | Dec. | 14 | 2010 | | | |
| April | 22 | 2009 | Dec. | 17 | 2010 | | | |
| April | 24 | 2009 | Dec. | 18 | 2010 | | | |
| May | 01 | 2009 | Dec. | 19 | 2010 | | | |
| Jun | 01 | 2009 | Dec. | 21 | 2010 | | | |
| Jul | 04 | 2009 | Dec. | 22 | 2010 | | | |
| Oct. | 12 | 2009 | Dec. | 25 | 2010 | | | |
| Oct. | 13 | 2009 | Dec. | 26 | 2010 | | | |
| Oct. | 19 | 2009 | Dec. | 28 | 2010 | | | |
| Jan. | 14 | 2010 | Dec. | 29 | 2010 | | | |
| Jan. | 17 | 2010 | Jan. | 01 | 2011 | | | |
| Jan. | 18 | 2010 | Jan. | 02 | 2011 | | | |
| Jan. | 19 | 2010 | Jan. | 30 | 2011 | | | |
| Jan. | 20 | 2010 | Feb. | 14 | 2011 | | | |
| Jan. | 21 | 2010 | Feb. | 15 | 2011 | | | |
| Jan. | 22 | 2010 | Feb. | 16 | 2011 | | | |
| Jan. | 23 | 2010 | Feb. | 17 | 2011 | | | |
| Jan. | 26 | 2010 | Feb. | 18 | 2011 | | | |
| Jan. | 29 | 2010 | Feb. | 18 | 2011 | | | |
| Feb | 04 | 2010 | Feb. | 24 | 2011 | | | |
| Feb | 05 | 2010 | Feb. | 25 | 2011 | | | |
| Feb. | 06 | 2010 | Mar. | 06 | 2011 | | | |
| Feb. | 09 | 2010 | Mar. | 13 | 2011 | | | |
| Feb. | 21 | 2010 | Mar. | 14 | 2011 | | | |
| Feb. | 23 | 2010 | Mar. | 16 | 2011 | | | |
| Feb. | 24 | 2010 | Mar. | 18 | 2011 | | | |
| Feb. | 26 | 2010 | Mar. | 19 | 2011 | | | |
| Feb. | 27 | 2010 | Mar. | 20 | 2011 | | | |
| Mar. | 02 | 2010 | Mar. | 21 | 2011 | | | |
| Mar. | 03 | 2010 | Mar. | 23 | 2011 | | | |
| Mar. | 10 | 2010 | Mar. | 24 | 2011 | | | |
| Mar. | 12 | 2010 | Mar. | 25 | 2011 | | | |
| Mar. | 30 | 2010 | Mar. | 26 | 2011 | | | |
| Mar. | 31 | 2010 | Apr | 08 | 2011 | | | |
| April | 02 | 2010 | May | 14 | 2011 | | | |
| April | 04 | 2010 | May | 15 | 2011 | | | |
| April | 05 | 2010 | May | 16 | 2011 | | | |
| April | 11 | 2010 | May | 17 | 2011 | | | |
| April | 12 | 2010 | Jun | 06 | 2011 | | | |
| April | 20 | 2010 | Jun | 28 | 2011 | | | |
| April | 27 | 2010 | Oct | 03 | 2011 | | | |
| April | 28 | 2010 | Oct | 04 | 2011 | | | |
| May | 10 | 2010 | Oct | 05 | 2011 | | | |
| May | 25 | 2010 | Nov | 04 | 2011 | | | |
| Oct. | 17 | 2010 | Nov | 05 | 2011 | | | |
| Oct. | 23 | 2010 | Nov | 11 | 2011 | | | |
| Oct. | 24 | 2010 | Nov | 19 | 2011 | | | |

\* Dates gathered from publicly available rain and weather data collected at stations located near the
  Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, A&S Metals (Watsonville, CA)**
**Significant Rain Events,\* February 26, 2009 – March 6, 2012**

\* Dates gathered from publicly available rain and weather data collected at stations located near the
  Facility.